STATE OF NORTH CAROLINA v. DOCK WATSON

No. COA05-1439

(Filed 5 September 2006)

**1. Search and Seizure— warrantless search—motion to suppress—knowing and voluntary consent**

The trial court did not err in a first-degree rape and felonious larceny case by denying defendant's motion to suppress evidence recovered during the search of his residence, because: (1) evidence seized during a warrantless search is admissible if the State proves the owner freely and voluntarily, without coercion, duress, or fraud, consented to the search; and (2) although conflicting evidence was presented at the hearing, the trial court's findings are supported by competent evidence and support the conclusion that defendant's girlfriend knowingly and voluntarily consented to the search of the residence she owned and shared with defendant.

**2. Identification of Defendants— in-court identification—reasonable possibility of observation—credibility**

The trial court did not err in a first-degree rape and felonious larceny case by denying defendant's motion to suppress the victim's in-court identification of him even though defendant contends the victim identified defendant based on independent observations on later occasions and not from the source of the crime, because: (1) the victim viewed defendant's face from a couple of feet as he raped her, the victim observed defendant from a distance of one foot when he tapped her on the shoulder, she gave a detailed description of her assailant, and she unequivocally recognized and identified defendant as her assailant when she saw defendant's mug shot the day the rape occurred; (2) the State met its burden of showing a reasonable possibility of observation sufficient to permit subsequent identification; and (3) the credibility of the victim's identification of defendant and the weight to be given her testimony were properly submitted to the jury.

**3. Identification of Defendants— retrial—motion for voir dire—no showing of new facts or evidence**

The trial court did not err in a first-degree rape and felonious larceny case by denying defendant's motion to rehear his motion

for voir dire regarding the in-court identification of defendant during a retrial and his motion to suppress the evidence seized during the search of his residence, because: (1) where a voir dire hearing was held at a previous trial of a defendant, no voir dire hearing is necessary at a second trial unless defendant shows new facts or evidence different from that presented at the first hearing; (2) the viewing of a defendant in a courtroom during varying stages of a criminal proceeding by witnesses who are offered to testify as to the identity of defendant is not in and of itself such a confrontation as will taint an in-court identification unless other circumstances are shown which are unnecessarily suggestive; (3) defendant failed to show he was prejudiced when the victim viewed defendant during court proceedings subsequent to defendant's first trial; (4) defendant failed to show there was a reasonable possibility that, had the error in the question not been committed, a different result would have been reached at the trial; and (5) defendant abandoned his argument regarding the search of his residence when he failed to present any arguments in support of his assertion as required by N.C. R. App. P. 28(b)(6).

**4. Appeal and Error— preservation of issues—failure to object**

Although defendant contends the trial court erred in a first-degree rape and felonious larceny case by allowing the State to introduce evidence that defendant did not give a clarifying statement upon questioning allegedly in violation of his Fifth Amendment right to remain silent, this assignment of error is dismissed because: (1) neither of defendant's objections sought to exclude his statement that he wished to remain silent and invoke his right to counsel; (2) an investigator testified, without objection, that defendant stated he was not going to say anything that would incriminate him and that he wanted a lawyer; and (3) constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal.

**5. Evidence— hearsay—prison records of defendant's father—public records exception—relevancy**

The trial court did not err in a first-degree rape and felonious larceny case by admitting the prison records of defendant's father through the testimony of an investigator, because: (1) a witness testified that the DNA evidence could rule out over ninety-nine percent of the population, but could not rule out

STATE v. WATSON

[179 N.C. App. 228 (2006)]

paternal relatives of defendant as donors of the DNA; (2) the evidence was relevant to eliminate other potential perpetrators of the rape including paternal relatives of defendant; (3) defendant failed to show that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice; and (4) the prison records are admissible under the public records exception under N.C.G.S. § 8C-1, Rule 803(8) since the sources of the information or other circumstances in this case do not indicate lack of trustworthiness.

**6. Evidence— testimony—defendant had no brothers—personal knowledge**

The trial court did not err in a first-degree rape and felonious larceny case by allowing an investigator to testify that defendant had no brothers, because: (1) the investigator testified based on his research during the course of his investigation; and (2) defense counsel had the opportunity, but failed to cross-examine the investigator on the results of his research and conclusion.

**7. Larceny— failure to instruct on lesser-included offense— unauthorized use of a conveyance**

The trial court did not err in a felonious larceny case by denying defendant's request to instruct the jury on the lesser-included offense of unauthorized use of a conveyance, because defendant presented no evidence that when he took and drove the vehicle, it was his intent only to temporarily, and not permanently, deprive the victim of possession of her motor vehicle.

**8. Rape— first-degree—motion to dismiss—sufficiency of evidence**

The trial court did not err by denying defendant's motion to dismiss the charge of first-degree rape, because viewed in the light most favorable to the State, the evidence revealed that: (1) the victim's testimony tended to show defendant penetrated her vagina; and (2) defendant threatened and pressed an eight-inch long knife against the victim's face before and after the assault.

Appeal by defendant from judgments entered 18 April 2005 by Judge Jack W. Jenkins in Beaufort County Superior Court. Heard in the Court of Appeals 22 August 2006.

**STATE v. WATSON**

[179 N.C. App. 228 (2006)]

*Attorney General Roy Cooper, by Assistant Attorney General Jay L. Osborne, for the State.*

*McCotter, Ashton & Smith, P.A., by Rudolph A. Ashton, III, and Terri W. Sharp, for defendant-appellant.*

TYSON, Judge.

Dock Watson ("defendant") appeals from judgments entered after a jury found him to be guilty of first-degree rape and felonious larceny. We find no error.

## I. Background

J.H. ("the complainant") volunteered as a cheerleading coach at a public school in Beaufort County. On 15 July 2003, boxes of cheerleading apparel arrived at the school's office. At approximately 11:30 a.m., the complainant decided to pickup some of the boxes from the office and unload them at the cheerleading room to prepare for cheerleading camp. The cheerleading room was located down a small path behind the school next to the football and baseball fields.

The complainant parked her blue Ford Explorer by the cheerleading room, went inside, and began to unload the boxes. After approximately five minutes, someone tapped the complainant on the shoulder. The complainant turned and observed a light-skinned black male holding an eight-inch-long hunting knife. The complainant described the male as having facial hair trimmed to a goatee, a gap between his two front teeth, and wearing an earring in his left ear, a white T-shirt, blue jeans, and a black "do-rag." The male put the knife against the complainant's face and demanded she remove her pants and lie down on the floor. The complainant complied. The male climbed on top of the complainant and attempted to insert his penis into her vagina. The male successfully penetrated the complainant at least once and remained on top of her for approximately five minutes.

The male told the complainant to get up, and she walked backwards to the rear of the room. The male walked, facing the complainant, with the knife pressed against her face. When the complainant got close enough, she jumped into a small bathroom and kept the door closed with her feet. The male tried to push his way into the bathroom, but was unsuccessful after several attempts. The complainant heard her vehicle start and drive away. The complainant ran to the teacher's lounge and contacted police. She gave police a detailed description of her assailant, car, and driver's license number.

STATE v. WATSON

[179 N.C. App. 228 (2006)]

Beaufort County Sheriff's Deputy Clayton Miller ("Deputy Miller") was instructed to patrol Highway 17 to be on the lookout for the complainant's vehicle. Deputy Miller observed a blue Ford Explorer parked on a dirt path next to a power supply station located four to five miles from the school. Deputy Miller observed a black male running from the vehicle. Deputy Miller ordered the individual to stop and placed him under arrest at approximately 12:15 p.m. The individual arrested was later identified as defendant.

Defendant was transported to the school for the complainant to identify him in a "show up." The complainant viewed defendant from a window in the principal's office. Law enforcement officers turned off the lights and adjusted the blinds in order that individuals located outside could not see inside the office. Defendant was wearing different clothes than what the complainant described her attacker as wearing. The complainant could not positively identify defendant. Defendant was brought back a second time so that the complainant could view the gap in his teeth. The complainant attempted to move closer to the window to view defendant, but law enforcement officers would only allow her to approach as far as the front of the desk. The complainant could not positively identify the suspect from that distance. The complainant explained her attacker was only a foot away from her when she was raped. She could not positively identify defendant as her attacker while she was located inside the principal's office.

As the complainant left to go to the hospital, she walked by a deputy sheriff's vehicle where defendant was sitting in the passenger's seat. The complainant was approximately six to eight feet away from the side of the vehicle. The complainant observed the side profile of defendant's face. The complainant stated to her sister, "it looked like him," but she "wasn't one hundred percent sure." Later that evening, the complainant saw a mug shot of defendant on the eleven o'clock news. The complainant immediately began crying and told her husband "that was him," the male who had raped her.

In the afternoon of 15 July 2003, Sergeant Laurel Miller ("Sergeant Miller"), along with other deputy sheriffs, was ordered to conduct a search of defendant's residence. Investigator Gentry Pinner ("Investigator Pinner") went to the hospital to obtain consent from Christie Boone ("Boone"), the owner of the residence where defendant also resided.

Earlier in the day, Boone had been transported by ambulance to the Beaufort County Hospital Emergency Department at approximately 1:17 p.m. Matthew Pitman ("Pitman"), a nurse practitioner, examined Boone. Boone's chief complaint was pain in her right shoulder, and two medications were administered by injection. Boone was given Toradol for pain and an one-half dose of Vistaril for anxiety. Pitman compared this dosage of Vistaril to two Benadryl tablets and noted the drug could potentially make a patient drowsy. Pitman testified these medications were non-narcotic and generally do not affect an individual's mental capacity. Pitman testified Boone was alert and oriented and her mental faculties were normal at the time she was treated.

When Investigator Pinner arrived at the hospital, he informed Boone that defendant was a suspect in an investigation and he requested permission to search her residence. Boone verbally agreed and signed a form granting permission to the search. Boone informed Investigator Pinner that defendant did not have exclusive possession of any portion of the residence. Investigator Pinner told Sergeant Miller to proceed with the search.

Investigator Pinner also took a statement from Boone, which was reduced to writing. Boone indicated that she was not under the influence of any drug or alcohol at that time. Boone told Investigator Pinner that she had an eleventh-grade education. Boone also provided her birth date and Social Security number. Boone told Investigator Pinner that some time after 11:00 a.m., defendant had entered the residence and told her "he had got a car." Boone noticed defendant was in possession of a clear cellular telephone and five "cards" that did not belong to him. One of the cards was a Chocowinity Club Card with the name of the school where the complainant volunteered printed thereon. Boone signed this statement, although her signature was "messy." Boone's mother was present and signed the statement as a witness.

At trial, Boone asserted she could not remember anything from the time she was injected with medication at the hospital. She did not remember talking with Investigator Pinner, signing the permission to search form, or giving or signing a statement.

During the first search of Boone's residence, investigators found a white T-shirt, a black nylon head cover or "do-rag," a red checkbook belonging to the complainant, and the complainant's driver's license. Investigators also found several of the complainant's discount cards,

credit cards, and Social Security cards inside Boone's residence. Additional evidence was seized at the site where the complainant's vehicle was recovered. Investigator Kenneth Watson located several "shoe track" impressions located by the driver's side door. Other shoe impressions were found on the path between the power station and the trailer park, where defendant and Boone resided. The shoe track impressions were consistent with the soles of the boots defendant wore.

Later that evening, at approximately 6:15 p.m., Investigator Pinner, along with Washington Police Detective Cliff Hales ("Detective Hales"), approached Boone for permission to search her residence a second time. Detective Hales was investigating another rape which occurred a few days prior to 15 July 2003. Boone signed a second "Permission to Search" form in the presence of Investigator Pinner and Detective Hales. No additional evidence was seized.

DNA tests were conducted on the material contained on vaginal swabs collected from the complainant. The results indicated a "Y" chromosome profile consistent with the profile of defendant and his paternal relatives. Investigator Pinner testified that defendant's father, Martin Watson, was incarcerated at the time of the rape and that defendant had no brothers.

Defendant was tried in Beaufort County Superior Court in September 2004. The jury was unable to reach a verdict on the first-degree rape and felony larceny charges. The trial court declared a mistrial on 14 September 2004.

Defendant was re-tried in April 2005. The jury found defendant to be guilty of first-degree rape and felonious larceny. Defendant was sentenced as a prior record level II within the presumptive range to a minimum term of 324 months and a maximum term of 398 months for the first-degree rape conviction and to a minimum of ten months and a maximum of twelve months for the felonious larceny conviction. Defendant appeals.

## II. Issues

Defendant argues the trial court erred by: (1) denying his motion to suppress evidence recovered during the search of his residence; (2) denying his motion to suppress the complainant's in-court identification of him; (3) denying his motion to rehear his motion to suppress the search of his residence and his motion for *voir dire* regarding the in-court identification; (4) allowing the State to introduce

STATE v. WATSON

[179 N.C. App. 228 (2006)]

evidence that he did not give a clarifying statement upon questioning; (5) admitting the prison records of his father; (6) allowing Investigator Pinner to testify he had no brothers; (7) denying his request to instruct to the jury on the lesser included offense of unauthorized use of a conveyance; and (8) denying his motion to dismiss the first-degree rape charge.

### III. Motion to Suppress the Search of Defendant's Residence

[1] Defendant argues the trial court erred in denying his motion to suppress the evidence recovered from his residence and asserts Boone did not voluntarily consent to the search. We disagree.

Boone testified at the hearing on defendant's motion to suppress that on 15 July 2003 she was defendant's girlfriend and resided with defendant at 130 Whitfield Mobile Home Park in Chocowinity. Defendant did not maintain exclusive possession of any portion of the residence.

Boone testified she remembered defendant being arrested on 15 July 2003, but had no recollection of anything else that occurred that day. She did not remember being transported to the hospital via ambulance, being treated other than receiving a shot, or speaking with Investigator Pinner. Boone specifically did not recall giving Investigator Pinner consent to search her residence, signing the consent to search form, or giving and signed any statements to Investigator Pinner.

Boone had complained of shoulder pain and was treated at the Beaufort County Hospital on 15 July at approximately 1:17 p.m. Pitman, a nurse practitioner, administered Boone medication. The trial court found:

8. Pittman [sic] indicated [Boone] was alert and oriented as to person, place, and time. Her eyes were open and her speech was normal. She was mildly reclined and able to sit up under her own strength. Pittman [sic] indicated that Boone was uncomfortable and extremely anxious and restless. Pittman [sic] did state that he was not very impressed with her level of anxiety, and as a result, prescribed only a 1/2 dose of Vistaril, 50 mgs, by injection. Pittman [sic] compared this dose of Vistaril to two tablets of Benadryl. He also administered 60 mgs of Toradol, a pain reliever, by injection. Pittman [sic] stated that these medications were non-narcotic, so they generally do not affect one's mental capacity.

Pitman testified he did not observe any behavior from Boone to indi-cate she was not in possession of her mental faculties.

Investigator Pinner arrived at the hospital at approximately 1:50 p.m. Investigator Pinner testified he observed nothing to indicate Boone was not in possession of her mental faculties. Boone told Investigator Pinner that she was not under the influence of alcohol or drugs. Investigator Pinner read Boone the consent to search and obtained her consent to search the residence between 1:50 p.m. and 2:25 p.m. Investigator Pinner obtained a statement from Boone at approximately 3:00 p.m. Boone's mother signed the written statement as a witness.

Boone was discharged from the hospital at 3:15 p.m. Investigator Pinner approached Boone at home again at 6:15 p.m. for consent to search her residence. The second search was requested by the Washington Police Department, which was investigating another rape. To the knowledge of Investigator Pinner, no additional evidence was seized.

Defendant contends the trial court's findings of fact numbered 17 and 18 and the trial court's conclusions of law numbered 3 and 4 are erroneous.

## A.  Standard of Review

"Findings of fact that are supported by competent evidence are binding on appeal. However, the conclusions of law drawn from those findings are reviewable [*de novo*] by the appellate courts." *State v. Williams*, 314 N.C. 337, 345, 333 S.E.2d 708, 715 (1985). Findings of fact which are not excepted to are binding on appeal. *State v. Watkins*, 337 N.C. 437, 438, 446 S.E.2d 67, 68 (1994).

> Where the evidence is conflicting (as here), the judge must resolve the conflict. He sees the witnesses, observes their demeanor as they testify and by reason of his more favorable position, he is given the responsibility of discovering the truth. The appellate court is much less favored because it sees only a cold, written record. Hence the findings of the trial judge are, and properly should be, conclusive on appeal if they are supported by the evidence.

*State v. Smith*, 278 N.C. 36, 41, 178 S.E.2d 597, 601 (1971).

## B.  Knowing and Voluntary Consent

Findings of fact numbered 17 and 18 state:

17.  The Court, in observing the demeanor of the aforementioned witnesses, finds that Christy [sic] Boone appeared to be extremely reluctant to testify against her current boyfriend, the defendant. The Court further finds that Boone's total lack of memory of the events of July 15, 2003, is not credible, especially in light of medical evidence to the contrary. The medications administered to Boone at Beaufort County Hospital were non-narcotic.

18.  The Court finds that the warrantless search of the residence located at Lot 130, Whitfield Mobile Home Park, Chocowinity, North Carolina, was consented to by Christy [sic] Boone, and her consent and permission was given freely and voluntarily and without any promises or threats of any kind made against her. Furthermore, Boone's consent was given intelligently and at that time, she was in possession of her mental faculties.

The trial court concluded:

3.  The consent to search given by Christy [sic] Boone was given freely, voluntarily, and intelligently, without coercion, duress or fraud.

4.  All evidence seized as a result of the search on July 15, 2003, is deemed admissible.

"Evidence seized during a warrantless search is admissible if the State proves that the [owner] freely and voluntarily, without coercion, duress, or fraud, consented to the search." *Williams*, 314 N.C. at 344, 333 S.E.2d at 714 (citing *State v. Long*, 293 N.C. 286, 237 S.E.2d 728 (1977)). A court examines the totality of the circumstances at the time of the search in determining whether consent was voluntary. *Id.*

Although conflicting evidence was presented at the hearing, the trial court's findings of fact are supported by competent evidence. *Id.* at 345, 333 S.E.2d at 715. The trial court's findings of fact support its conclusion that Boone knowingly and voluntarily consented to the search of the residence she shared with defendant. *Id.* This assignment of error is overruled.

## IV. In-Court Identification of Defendant

**[2]** Defendant argues the trial court erred in denying his motion to suppress the complainant's in-court identification of him. We disagree.

The trial court granted defendant's motion for a *voir dire* hearing prior to allowing the complainant to identify defendant in the presence of the jury. Subsequent to the *voir dire* hearing, the trial court permitted the complainant to identify defendant in the presence of the jury. Defendant argues: (1) the complainant's in-court identification "was based on highly suggestive sightings of the defendant on later occasions, and not from the source of the crime" and (2) the "show-up" was "so impermissibly suggestive that it created a substantial likelihood of irreparable misidentification."

The credibility and weight to be given to witness identification is for the jury to determine, unless the identification evidence is "inherently incredible." *State v. Turner*, 305 N.C. 356, 362, 289 S.E.2d 368, 372 (1982) (citations omitted).

> [T]he test to be employed to determine whether the identification evidence is inherently incredible is whether there is a reasonable possibility of observation sufficient to permit subsequent identification. Where such a possibility exists, the credibility of the witness' identification and the weight given his testimony is for the jury to decide.

*Id.* at 363, 289 S.E.2d at 372.

> [R]eliability is the linchpin in determining the admissibility of identification testimony . . . . The factors to be considered are . . . the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Id.* at 364-65, 289 S.E.2d at 373-74 (quotation omitted).

The complainant viewed defendant while located inside the principal's office through a window and "wasn't 100 percent for sure" defendant assaulted her. Law enforcement officers escorted defendant away. The complainant requested defendant be returned so that she could view the gap in his teeth. After the second viewing, the

complainant was not "100%" sure whether defendant was her assailant. The complainant told law enforcement officers defendant was located too far away for her to positively identify him. Investigator Pinner did not allow the complainant to walk closer to the window to view defendant.

As the complainant left the school, she observed defendant seated in a patrol car from a distance of six to eight feet. The complainant remained unsure whether defendant was her assailant. Later that evening, the complainant saw a "mug shot" of defendant on television. The complainant immediately began crying and told her husband, "I know it's him." The complainant testified, "Because it was so close up I knew it was him."

The complainant failed to identify defendant as her assailant during the "show-up" procedure. In *State v. Waters*, the rape complainant was shown a single photograph of a white male matching the description of her assailant. 308 N.C. 348, 352, 302 S.E.2d 188, 191 (1983). The complainant stated the person in the photograph was not her assailant. *Id.* Our Supreme Court held, "We fail to see how this specific photographic 'show-up' could in any way lead to a possible misidentification of the defendant in court." *Id.* Here, defendant has failed to demonstrate how the "show-up" could have resulted in a misidentification of him. *Id.* Defendant's argument that the "show-up" was impermissibly suggestive is without merit.

The complainant's identification of defendant was based on her observation of him and it was reliable. *Turner*, 305 N.C. at 364-65, 289 S.E.2d at 373-74. The complainant viewed defendant's face from a "couple of feet" as he raped her. The complainant also observed defendant from a distance of one foot when he tapped her on the shoulder. The complainant gave a detailed description of her assailant being a light-skinned black male wearing a "du-rag," white T-shirt, and jeans. He wore a "little gold hoop earring" and facial hair. The complainant described defendant as having a "large gap in between his two front teeth." The complainant saw defendant's "mug shot" the day the rape occurred, unequivocally recognized, and identified defendant as her assailant.

The State met its burden of showing a "reasonable possibility of observation sufficient to permit subsequent identification." *Id.* at 363, 289 S.E.2d at 372. The credibility of the complainant's identification of defendant and the weight to be given her testimony were properly submitted to the jury. *Id.* The trial court did not err in concluding the

complainant identified defendant based upon her independent obser-
vations. This assignment of error is overruled.

## V. Defendant's Motion to Rehear

**[3]** Defendant argues the trial court erred in denying his motion to
rehear his motion to suppress the search of his residence and his
motion for *voir dire* regarding the in-court identification.

The trial court heard defendant's motion to suppress the search
of his residence and motion for *voir dire* regarding the in-court iden-
tification prior to his first trial. Upon re-trial, defendant filed a new
motion to suppress the search of his residence and a motion for *voir
dire* regarding the in-court identification. The trial court denied both
motions, finding "there has been an insufficient showing to satisfy
this Court that there are any new facts or circumstances sufficient to
justify this Court reviewing or re-visiting the previous rulings of
Judge Everett in the first trial."

Where a *voir dire* hearing was held at a previous trial of a defend-
ant, no *voir dire* hearing is necessary at a second trial unless the
defendant shows new facts or evidence different from that presented
at the first hearing. *State v. Moses*, 52 N.C. App. 412, 415, 279 S.E.2d
59, 62 (1981).

Defendant argues the complainant "had much more opportunity
to see the defendant while in court during the first trial, which
constituted new and different evidence from what was testified in
the first *voir dire* hearing." In *State v. Hannah*, our Supreme
Court stated:

> We have held that the viewing of a defendant in a courtroom dur-
> ing varying stages of a criminal proceeding by witnesses who are
> offered to testify as to the identity of the defendant is not in and
> of itself such a confrontation as will taint an in-court identifica-
> tion unless other circumstances are shown which are so unnec-
> essarily suggestive and conducive to irreparable mistaken identi-
> fication as would deprive defendant of his due process rights.

312 N.C. 286, 292, 322 S.E.2d 148, 152 (1984).

The complainant viewed defendant numerous times prior to and
during defendant's first trial. Defendant has failed to show he was
prejudiced by the trial court's failure to rehear his motion for *voir
dire* regarding the in-court identification where the complainant

viewed defendant during court proceedings subsequent to defendant's first trial. Defendant has also failed to show "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C. Gen. Stat. § 15A-1443 (2005). This assignment of error is overruled.

While the heading of defendant's argument in his brief indicates that the trial court also erred in denying his motion to rehear the motion to suppress the search of his residence, defendant fails to present any arguments in support of this assertion. This argument is deemed abandoned. N.C.R. App. P. 28(b)(6) (2006) ("Assignments of error not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned."). This assignment of error is dismissed.

## VI. Right to Remain Silent

[4] Defendant argues the trial court erred in allowing the State to introduce evidence that he failed, upon questioning, to make a clarifying statement in violation of his Fifth Amendment right to remain silent.

Defendant was questioned by police on 15 July 2003 at 12:45 p.m. and again at 1:40 p.m. In his first interview, defendant told Investigator Pinner that "a guy named Mike" came to his house. Mike allegedly showed defendant $300.00 and asked defendant to move a vehicle. Defendant described Mike as a black male wearing a white T-shirt, blue jeans, one earring, and a stocking cap. Mike rode a burgundy mountain bike. At trial, the State permitted Investigator Pinner to read into evidence a typewritten statement prepared by police following defendant's second interview.

Investigator Pinner testified regarding defendant's second interview:

Q: And did you advise Dock Watson of his so-called Miranda Rights again?

A: Yes, I did.

Q: And, having already done that once at the school, why did you do it again at the Sheriff's Office?

A: Because there was a break in the time that I interviewed him. With a break like that, he needed to be re-advised of his Miranda

rights since the interview didn't run straight through to this time frame.

. . . .

Q: Did you ask him if he understood the rights?

A: Yes, I did.

Q: And what did he say?

A: He said that he understood—

Defense Counsel: Your Honor, I'm going to object. May we be heard at the bench?

The Court: Yes.

. . . .

The Court: Mr. Edwards, you may need to rephrase your question or ask your next question.

Investigator Pinner continued to testify, without objection, that he advised defendant of his right to have counsel appointed to him. Defendant stated he wished to speak without a lawyer. Later in the testimony, defendant objected regarding the second interview as follows:

Q: And if you would please tell us about your interview or conversation with Dock Watson at that time.

A: I interviewed Dock Watson a second time. Due to the break in custody and interview, I advised Watson of his rights again. Watson waived his rights. I advised Watson that we were able to dispute the story—

Defense Counsel: Objection to that phrase and motion to strike, Your Honor.

The Court: All right. Objection is duly noted and overruled. You may proceed.

Q: Would you start that sentence over again?

A: Sure. I advised Watson that we were able to dispute the story he had given of the individual named Mike and advised him of the other interviews that had been conducted and everything was

pointing at him. He then stated that he was not going to say anything that would incriminate him and that he wanted a lawyer. The interview was terminated at the request of an attorney.

It is well established that "the State may not introduce evidence that a defendant exercised his [F]ifth [A]mendment right to remain silent." *State v. Ladd*, 308 N.C. 272, 283, 302 S.E.2d 164, 171 (1983). However, neither of defendant's objections sought to exclude his statement that he wished to remain silent and invoke his right to counsel.

Investigator Pinner testified, without objection, that defendant stated "he was not going to say anything that would incriminate him and that he wanted a lawyer." Constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal. *State v. Benson*, 323 N.C. 318, 322, 372 S.E.2d 517, 519 (1988). Defendant failed to properly preserve this issue for our review, and it is dismissed.

## VII. Prison Records of Defendant's Father

[5] Defendant argues the trial court erred in admitting prison records on his father. Defendant contends these records are hearsay, and the prejudicial effect of their admission outweighed their relevance. We disagree.

## A. Relevance

Shawn Weiss ("Weiss") testified regarding the results of the DNA evidence collected from the complainant's body. Weiss testified that *the "Y" chromosome analysis revealed DNA evidence consistent with* defendant's DNA. Weiss testified, without objection, the "Y" chromosome analysis could rule out over ninety-nine percent of the population, but could not rule out paternal relatives of defendant as donors of the DNA.

Prison records showed Martin Watson, defendant's father, was incarcerated at the time of the alleged rape. They also revealed that Martin Watson's father, defendant's grandfather, was deceased and that Martin Watson had no living brothers. Investigator Pinner testified that defendant had no living brothers.

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2005). The evidence of

prison records on defendant's father is relevant to eliminate other potential perpetrators of the rape; i.e., paternal relatives of defendant. Defendant has failed to show that the "probative value [of this evidence] is substantially outweighed by the danger of unfair prejudice." N.C. Gen. Stat. § 8C-1, Rule 403 (2005). This assignment of error is overruled.

### B.  Hearsay

Defendant argues the prison records constitute inadmissible hearsay evidence. The prison records were introduced through testimony from Investigator Pinner. The document is signed by the Inmate Records Coordinator of Attica Correctional Facility in New York. The certification indicates that the records are true and exact copies of the file for inmate Martin Watson, and that they were kept in the regular course of business. During the course of his investigation, Investigator Pinner determined that Martin Watson was the father of defendant.

"It has long been the law in this State that original official records are admissible into evidence, when properly authenticated, for purposes of proof of matters relevant to the information contained in the official record." *State v. Joyner*, 295 N.C. 55, 62, 243 S.E.2d 367, 372 (1978). Extrinsic evidence of authenticity is not a condition precedent for the admissibility of documents bearing seal and certified copies of public records. N.C. Gen. Stat. § 8C-1, Rule 902 (2005).

Prison records on defendant's father are admissible under the public records exception to the hearsay rule. Public records are defined under Rule 803(8) of the North Carolina Rules of Evidence, which provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (8)  Public Records and Reports.—Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law-enforcement personnel . . . .

N.C. Gen. Stat. § 8C-1, Rule 803(8) (2005).

North Carolina has not previously considered whether prison records are admissible as public records under this exception to the hearsay rule. Federal Rule of Evidence 803(8) is identical to our rule. *See* Fed. R. Evid. 803(8) (2005).

The United States Court of Appeals for the Ninth Circuit considered this issue in *United States v. Weiland*, 420 F.3d 1062 (2005). The Court held documents contained in the defendant's "penitentiary packet" were admissible under the public records exception. We agree "that 'the sources of the information or other circumstances' in this case do not 'indicate lack of trustworthiness.' " *Id.* at 1075 (quoting Fed. R. Evid. 803(8)); *see State v. Woody*, 102 N.C. App. 576, 578, 402 S.E.2d 848, 850 (1991) ("[R]eceiving the civil part of the revocation order into evidence to show that defendant's driver's license was revoked and he knew it was authorized by the public records exception to the hearsay rule."). This assignment of error is overruled.

**[6]** In a related assignment of error, defendant argues the trial court erred in allowing Investigator Pinner to testify that he had no brothers without a sufficient foundation that the testimony came from Investigator Pinner's personal knowledge.

Rule 602 of the North Carolina Rules of Evidence states, "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." N.C. Gen. Stat. § 8C-1, Rule 602 (2005).

Investigator Pinner testified that during the course of his investigation he determined whether defendant had any brothers. Based on his research, Investigator Pinner concluded defendant had no living brothers. Defense counsel had the opportunity, but failed to cross-examine Investigator Pinner on the results of his research and conclusion. Defendant failed to show the trial court erred in allowing Investigator Pinner to testify defendant had no brothers based on his research. This assignment of error is overruled.

## VIII. Jury Instruction

**[7]** Defendant argues the trial court erred in denying his request to instruct the jury on the lesser included offense of unauthorized use of a motor vehicle on the larceny charge. We disagree.

Defendant was indicted for felonious larceny of the complainant's vehicle under N.C. Gen. Stat. § 14-72. "To convict a defendant of larceny, the State must show that the defendant: '(1) took the property

of another; (2) carried it away; (3) without the owner's consent; and (4) with the intent to deprive the owner of the property permanently.' " *State v. Jackson*, 75 N.C. App. 294, 297, 330 S.E.2d 668, 669 (1985) (quoting *State v. Reeves*, 62 N.C. App. 219, 223, 302 S.E.2d 658, 660 (1983)). Larceny of property valued more than $1,000.00 is a Class H felony. N.C. Gen. Stat. § 14-72(a) (2005).

The unauthorized use of a motor vehicle requires a person to take or operate a motor vehicle "without the express or implied consent of the owner or person in lawful possession." N.C. Gen. Stat. § 14-72.2(a) (2005). The unauthorized use of a motor vehicle is a lesser included offense of larceny where there is evidence to support the charge. *State v. Ross*, 46 N.C. App. 338, 339, 264 S.E.2d 742, 743 (1980).

"The trial court is not required to instruct the jury on a lesser included offense to the original crime unless the offense arises on the evidence." *Jackson*, 75 N.C. App. at 298, 330 S.E.2d at 670 (citation omitted). In the absence of any conflicting evidence to show defendant did not intend to permanently deprive the owner of possession of her motor vehicle, it was proper for the trial court to instruct the jury on the greater offense of larceny alone. *Id.*

Defendant argues the trial court should have instructed the jury on the lesser included offense because evidence presented at trial showed he told Investigator Pinner that a person named "Mike" showed him $300.00 and asked him to move the vehicle. We disagree.

Defendant told Investigator Pinner that "a guy named Mike" came to his residence on 15 July 2003. "Mike" allegedly showed defendant $300.00 and asked defendant to move a vehicle. The record and transcript does not reveal anything further about the matter. No evidence was presented that defendant drove or moved the vehicle for "Mike." Defendant presented no evidence that, when he took and drove the vehicle, it was his intent only to temporarily, and not permanently, deprive the complainant of possession of her motor vehicle. *Id.* This assignment of error is overruled.

## IX. Motion to Dismiss

[8] Defendant asserts the trial court erred in denying his motion to dismiss the first-degree rape charge. Defendant argues insufficient evidence of penetration was presented at trial to submit the charge of first-degree rape to the jury. We disagree.

STATE v. WATSON

[179 N.C. App. 228 (2006)]

The standard for ruling on a motion to dismiss is whether there is substantial evidence (1) of each essential element of the offense charged and (2) that defendant is the perpetrator of the offense. Substantial evidence is relevant evidence which a reasonable mind might accept as adequate to support a conclusion. In ruling on a motion to dismiss, the trial court must consider all of the evidence in the light most favorable to the State, and the State is entitled to all reasonable inferences which may be drawn from the evidence. Any contradictions or discrepancies arising from the evidence are properly left for the jury to resolve and do not warrant dismissal.

*State v. Wood*, 174 N.C. App. 790, 795, 622 S.E.2d 120, 123 (2005) (internal quotations omitted).

A defendant is guilty of first-degree rape if the defendant engages in vaginal intercourse with the victim by force and against the victim's will, and either: (1) employs or displays a dangerous or deadly weapon or an article which the victim reasonably believes to be a dangerous or deadly weapon; or (2) inflicts serious personal injury upon the victim or another person. N.C. Gen. Stat. § 14-27.2 (2005). Vaginal intercourse is defined as "the slightest penetration of the female sex organ by the male sex organ." *State v. Brown*, 312 N.C. 237, 244-45, 321 S.E.2d 856, 861 (1984).

The complainant testified that defendant's penis penetrated her vagina "more than once." During direct examination, the complainant testified:

Q: And do you know how many times he tried to put it in you?

A: Probably around 10 or 15 times.

Q: Now, [J.H], as far as you know, was he wearing a condom?

A: I don't think so.

. . . .

Q: Now, [J.H.], did this person's penis penetrate your vagina?

A: Yes.

Q: Can you explain?

A: He kept going in my vagina, and I would try to contract my muscles to push it back out, but it had gone in it so I could contract it out.

Q: Are you familiar with the term "labia"?

A: Yes, sir.

. . . .

Q: And can you tell us whether his penis got past the labia or the lips?

A: Yes, it did.

Q: Do you know how many times or whether it was more than once?

A: Yes, it was more than once.

Viewed in the light most favorable to the State, the complainant's testimony tends to show defendant penetrated her vagina. Substantial evidence was also presented to show defendant threatened and pressed an "eight-inch long knife" against the complainant's face before and after the assault. The trial court properly denied defendant's motion to dismiss the first-degree rape charge. This assignment of error is overruled.

## X. Conclusion

The trial court did not err in denying defendant's motion to suppress evidence recovered from his residence and motion to suppress the complainant's in-court identification of defendant. The trial court did not err in declining to rehear defendant's motion to suppress the search of his residence or motion for *voir dire* regarding the complainant's in-court identification without defendant presenting new evidence that was presented when these motions were heard at his first trial.

Defendant failed to properly preserve his argument on appeal that his Fifth Amendment right to remain silent was violated. The trial court properly admitted the prison records of defendant's father to eliminate paternal relatives of defendant as perpetrators of the rape and properly allowed Investigator Pinner to testify that defendant had no brothers.

The trial court did not err in denying defendant's request to instruct the jury on the lesser included offense of unauthorized use of a motor vehicle on the larceny charge. The trial court properly denied defendant's motion to dismiss the first-degree rape charge after the State presented evidence of vaginal penetration and defendant's use

of a deadly weapon. Defendant received a fair trial free from preju-
dicial errors he preserved, assigned, and argued.

No Error.

Judges WYNN and HUDSON concur.